# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
May 22, 2001 Session

## STATE OF TENNESSEE v. AMOS L. BROWN

**Direct Appeal from the Criminal Court for McMinn County**
**No. 98-105 & 98-105-B     R. Steven Bebb, Judge**

---

**No. E2000-00285-CCA-R3-CD**
**February 4, 2002**

In May 1999, a McMinn County jury found the Defendant guilty of the felony murder of one victim and of the criminally negligent homicide of a second victim. The trial court sentenced the Defendant as a Range I standard offender to concurrent sentences of life in prison for the felony murder conviction and two years incarceration for the criminally negligent homicide conviction. In this appeal as of right, the Defendant presents the following issues for our review: (1) whether sufficient evidence was presented at trial to support his conviction for felony murder; (2) whether the trial court erred by refusing to order the State to reveal the identity of a confidential informant; (3) whether the trial court erred by allowing the Defendant's co-defendant to testify against him at trial; (4) whether the trial court erred by allowing the jury to view a video tape of the Defendant's arrest; (5) whether the trial court allowed the jury to hear inadmissible hearsay testimony; (6) whether the trial court erred by allowing into evidence the entire written statement of the co-defendant; (7) whether the Defendant was denied a fair trial as a result of the State's failure to disclose exculpatory information; and (8) whether the trial court erred by denying the Defendant's motion requesting individual voir dire of the potential jurors concerning pretrial publicity. Finding no error by the trial court, we affirm the Defendant's convictions.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and THOMAS T. WOODALL, J., joined.

Gregory Scott Kanavos and Henry Franklin Chancey, Cleveland, Tennessee, for the Appellant, Amos L. Brown.

Paul G. Summers, Attorney General and Reporter; Elizabeth B. Marney, Assistant Attorney General; Jerry N. Estes, District Attorney General; William Reedy, Assistant District Attorney General; Amy Reedy, Assistant District Attorney General; and Daniel Cole, Assistant District Attorney General, for the Appellee, State of Tennessee.

# OPINION

On March 17, 1998, the McMinn County Grand Jury indicted the Defendant, Amos L. Brown, for the following offenses perpetrated against victim Larry Haupert: one count of premeditated first degree murder, or in the alternative, one count of felony murder, and one count of especially aggravated robbery. The Grand Jury also indicted the Defendant for the following offenses perpetrated against victim Renee Haupert: one count of premeditated first degree murder, or in the alternative, one count of felony murder, and one count of especially aggravated robbery. Following a trial conducted in May 1999, a McMinn County jury found the Defendant guilty of the felony murder of Larry Haupert and of the criminally negligent homicide of Renee Haupert. The trial court sentenced the Defendant as a Range I standard offender to concurrent sentences of life in prison for the felony murder conviction and two years incarceration for the criminally negligent homicide conviction.[1]

In this appeal as of right, the Defendant presents the following issues for our review: (1) whether sufficient evidence was presented at trial to support his conviction for felony murder; (2) whether the trial court erred by refusing to order the State to reveal the identity of a confidential informant; (3) whether the trial court erred by allowing co-defendant Herold Melton to testify against the Defendant at trial; (4) whether the trial court erred by allowing the jury to view a video tape of the Defendant's arrest; (5) whether the trial court allowed the jury to hear inadmissible hearsay testimony; (6) whether the trial court erred by allowing into evidence the entire written statement of co-defendant Herold Melton; (7) whether the Defendant was denied a fair trial as a result of the State's failure to disclose exculpatory information; and (8) whether the trial court erred by denying the Defendant's motion requesting individual voir dire of the potential jurors concerning pretrial publicity. Finding no error by the trial court, we affirm the Defendant's convictions.

The facts underlying this appeal are as follows: On Saturday evening, November 25, 1995, Dirk Alan Standridge, a resident of Etowah, Tennessee, received a phone call from his friend, Renee Haupert. Standridge testified at trial that Renee Haupert told him that she and her husband, Larry Haupert, whom Standridge heard talking in the background during the phone call, planned to stop by Standridge's house the following morning. They planned to pick up some personal items that Standridge was storing for them in his attic. However, the Hauperts failed to show up on Sunday morning. Standridge, who testified that Larry Haupert was not the most reliable person, was not surprised by this turn of events and decided to deliver the items to the Hauperts' home the following day.

On Monday, November 27, 1995, Standridge and his twin sons loaded the items into their truck and set out for the Haupert residence. When they arrived at the residence, Standridge sounded his horn, as he always did when visiting the Hauperts because of the Hauperts' dogs, which he described as "pretty rowdy." No one responded to the horn, so Standridge picked up the box

---

[1] The sentences were also to be served concurrently with a previous conviction that the Defendant had received for aggravated kidnapping.

containing the Hauperts' belongings and approached the door of the home. However, before Standridge could open the door, one of the dogs "raised his head up," and Standridge concluded that it would be best to leave the property before the dog became angry. He loaded the box back into the truck and had just helped both of his sons back into the cab of the truck when he noticed Larry Haupert lying in the yard. When he approached Mr. Haupert, he saw blood on Haupert's forehead and noted that Haupert was not breathing. Standridge testified that at this point, he went into shock. He stated that he left the property as quickly as possible so that his two sons would not see Larry Haupert's body, and he called 911 as soon as he returned to his own home.

Special Agent David Guy of the Tennessee Bureau of Investigation (T.B.I.) testified that he was called to the crime scene, along with numerous other law enforcement personnel, on November 27, 1995. The officers discovered the body of Larry Haupert lying in his yard and the body of Renee Haupert lying inside her home. Both victims had been shot several times, and Renee Haupert still held a cigarette in her hand that she was apparently smoking at the time of her death. Agent Guy testified that he was a member of a group of forensic scientists who specialized in certain areas of forensics, including ballistics, serology, fingerprints, and trace evidence. Guy stated that he aided the Nashville Crime Scene Unit in collecting several .22 caliber shells from the inside of the residence and from the exterior of the residence, most of which were sent to the crime lab for analysis.[2] Guy testified that officers also found weapons and unused ammunition inside the home.

Detective Gary Miller of the McMinn County Sheriff's Department testified that he investigated the Haupert homicides. He reported that on February 13, 1998, over two years after the murders, the Defendant, who was Larry Haupert's nephew, and the Defendant's friend, Herold Melton,[3] were arrested in connection with the crimes. Shortly after Melton's arrest, officers interviewed him and obtained a written statement. Miller stated that the Defendant was already in custody at the time of Melton's arrest, and Miller testified that he was present when officers interviewed the Defendant.

Detective Miller testified that on February 12, 1998, the day before the arrests of Herold Melton and the Defendant, he went to the home of Pam Melton, Herold Melton's sister-in-law, to attempt to obtain a recorded statement from the Defendant. Miller stated that the Defendant was to visit Pam Melton's home at 9:00 that evening. Miller planned to install a "listening device" underneath the dining room table and listen to the Defendant's conversation with Pam Melton from another room in the house. While waiting for the Defendant to arrive, Pam Melton received a phone call from the Defendant. Miller recalled that after speaking to the Defendant for a couple of minutes, Pam Melton told the Defendant, "I need to talk to you and you know what I want to talk to you about." Miller testified that at this point, Pam Melton handed him the phone, and he heard the

___

[2] Guy stated that some of the shell casings found outside the home were old and therefore were not sent to the crime lab for analysis.

[3] We note that the co-defendant's name is spelled "Harold Melton" throughout the record and "Herold Melton" in the indictment. Because the co-defendant did not specify the spelling of his name at trial, we will use the spelling of the co-defendant's name that is presented in the indictment.

Defendant say, "I don't want to talk about killing that mother f___ker." Miller testified that he recognized the Defendant's voice from speaking with him on the phone on a prior occasion, and he stated that he wrote the statement down immediately after hearing it.

Miller reported that thirty days after the murders in this case, the Governor's Office of the State of Tennessee, with the cooperation of the McMinn County Sheriff and the McMinn County District Attorney's Office, offered a $5,000 cash reward for any information leading to the arrest and conviction of anyone associated with the murders. Miller testified that his office pursued several "leads" prior to arresting the Defendant and Herold Melton. One such "lead" was provided by Patrick Alan Dyke, who testified at trial. Dyke testified that he lived approximately one-half of a mile from the Haupert residence. He told police that on the evening of Saturday, November 25, 1995, between 7:00 and 7:30 p.m., he heard a series of gunshots coming from the direction of the Haupert residence. Dyke stated that he noticed the gunshots because it was unusual for him to hear gunshots in that area. Shortly afterwards, he heard a truck with a loud muffler, which he testified appeared to be a Ford Ranger, drive away. Detective Miller testified that another individual told police that she saw a "brown rust Vega" leaving the Haupert residence at the approximate time of the murders. Miller further testified that a third individual reported seeing a person on foot carrying a rifle near the Haupert residence at the approximate time of the murders.

On cross-examination, Miller admitted that the police did not find any physical evidence at the crime scene, such as fingerprints or blood, which would link the Defendant to the crimes. However, Miller also reported that the only fingerprints found at the scene were those of the two victims.

Lieutenant Tim Smith of the McMinn County Sheriff's Department testified that he arrested Herold Melton for the crimes in this case. He stated that when he took Melton to jail, the Defendant was already in custody at the same jail. Smith recalled that when they arrived, the Defendant was in a nearby cell, approximately twenty feet from where Melton was standing. Smith stated that when the Defendant saw Herold Melton, he mouthed the words, "Don't say anything." Smith testified that although he had no expertise in lip-reading, he was able to read the Defendant's lips as the Defendant made the statement. Special Agent T.J. Jordan of the Tennessee Bureau of Investigation, who was also involved in the arrests and subsequent interviews of Herold Melton and the Defendant, verified this incident. He stated that he saw the Defendant "shake his head in a 'no' fashion [to Melton] and mouth[] 'Don't say nothing.'" Like Smith, Jordan testified on cross-examination that he had no expertise in lip-reading.

Agent Jordan also participated in taking Herold Melton's sworn statement that Melton provided to police on February 14, 1998. The statement, in which Melton admitted his involvement in the crimes, was admitted into evidence at trial. Agent Jordan testified that at the time Melton made the statement, he was promised no leniency or any other type of agreement from the State in exchange for the statement. However, Jordan testified that before Melton made the statement, Jordan told Melton that he had an audio tape of Melton "making admissions" to his brother, Mark Melton. Finally, Jordan testified that the portion of the statement in which Melton identified the

-4-

location of the murder weapon was false, but stated that in January 1999, Melton revealed to police the actual location of the weapon.

Co-defendant Herold Melton testified against the Defendant at trial. He stated that he was twenty-one years old at the time of trial. Melton admitted that prior to being arrested for the crimes in this case, he was convicted in juvenile court when he was fourteen years old for shooting a dog. He stated that he had also been convicted of unlawful consumption of alcohol.

Melton testified that he had been friends with the Defendant since he was a freshman in high school. He stated that when they "hung out" together, they "[rode] around, [went] to town, [shot] pool," and "[g]ot high" on marijuana and cocaine. Melton testified that at the time of the crimes in this case, he was a seventeen-year-old junior in high school, and the Defendant was a sophomore in high school. He recalled that prior to the crimes, he had once met Larry Haupert, the Defendant's uncle, at the home of the Defendant's grandmother.

Melton stated that he and the Defendant began to discuss killing Larry and Renee Haupert approximately a week and a half prior to the murders. He testified that the Defendant told him that Larry Haupert had between $20,000 and $30,000 at his home and that they could get the money if they killed the victims. They planned to take a gun to the Haupert residence so that they could pretend to try to sell it to Larry Haupert. According to Melton, he and the Defendant made a deal to split the money "fifty-fifty" and to each kill one of the victims. He explained that they made this arrangement so that neither of them would "rat on" the other.

Melton recalled that on the weekend of November 25, 1995, at "dusky dark," he drove to the Defendant's house to pick him up. They then drove to Melton's house to pick up his gun, a .22 caliber rifle. Melton testified that he had ammunition in his car. He reported that he and the Defendant ingested "[c]rack" cocaine before arriving at the Haupert residence, and he recalled that he was "pretty high" when they arrived. Melton stated that by the time he and the Defendant reached the Haupert residence, it was dark. They drove through the open gate at the entrance to the property, and when they reached the house, Melton noted that two vehicles were parked there, a Chevrolet truck and a BMW. Melton stated that when he and the Defendant arrived, the Hauperts were watching television in the living room of the house.

After speaking with Larry Haupert, the Defendant and Melton accompanied him and his wife outside to test the gun that they had brought. However, according to Melton, as Haupert carried beer bottles to his woodpile to set them up as targets, the Defendant shot Haupert in the back. Melton recalled that the Defendant shot Larry Haupert sixteen times, emptying the gun, and then asked Melton to reload the gun. After Melton completed this task, he and the Defendant escorted Renee Haupert back into the house to retrieve the money. Melton stated that Renee Haupert appeared to be in a state of shock. Melton testified that he and the Defendant took all the money that the Hauperts had in the house, which amounted to approximately $4,000, and according to Melton, the Defendant then told him to shoot Renee Haupert. Melton stated that he shot Mrs. Haupert in the chest, and she fell face-down onto the floor. He recalled that he then shot her a few more times.

According to Melton, after he and the Defendant committed the crimes, they left the Haupert property and returned to Melton's home, where he lived with his parents. Melton testified that he put the gun in the woods approximately 100 yards from his house, and he and the Defendant drove into town. According to Melton, they split the money evenly and then spent it primarily on drugs.

Melton reported that he later retrieved the gun used for the murders and put it back into his room so that his parents would not notice that it was missing. He stated that he subsequently moved the gun into a gun safe at his sister's house. Melton testified, however, that he and the Defendant decided that they "needed to get rid of" the gun, so they broke into his sister's house while she was at church and took her gun safe. Inside the safe were Herold Melton's gun, seven or eight other guns, and approximately $10,000 that Melton reported belonged to his parents. Melton testified that he and the Defendant took the money and spent it on drugs. He further testified that they threw the gun safe, which contained his gun and the other guns, into a rock quarry.

On cross-examination, Melton admitted that during the time period surrounding the crimes, he used drugs frequently. He also admitted that he initially lied to his father and to law enforcement officials by telling them that he did not steal the gun safe and money from his sister's house. He further admitted that he initially lied to T.B.I. Agent Jordan by telling him that he threw the murder weapon into the Tennessee River. Finally, Melton stated that he had entered into a plea agreement with the State whereby he would receive a sentence of twenty-five years incarceration in exchange for his testimony against the Defendant. He stated that under the agreement, he was required to cooperate with the State in an ongoing investigation of the crimes and to provide testimony consistent with the statement that he gave to police concerning the crimes.

Dr. Ron Toolsie, an expert in forensic pathology, testified that he performed autopsies on both victims in this case. Toolsie stated that at the time he performed the autopsies, on November 28 and 29, 1995, the two victims had been dead for a minimum of twenty-four hours, but he could not determine with any accuracy the exact time of death for either victim. Dr. Toolsie testified that Larry Haupert was shot thirteen times and that most of the bullets entered the body from behind. He reported that two of the bullets entered Mr. Haupert's head, and he stated that Mr. Haupert sustained five or six lethal bullet wounds. Toolsie further testified that Renee Haupert was shot a total of fifteen times; he stated that she was shot twice in the head, five times on the right side of her chest, twice on the front of her chest, once in the base of her neck, and once on her right shoulder. Toolsie stated that Mrs. Haupert also suffered multiple small caliber gunshot wounds. He testified that at least five of Renee Haupert's wounds were fatal. Toolsie testified that he recovered five projectiles from Mrs. Haupert's body and three projectiles from Mr. Haupert's body, which he released to T.B.I. Agent Guy. He reported that both victims were shot with a .22 caliber weapon and that all of their wounds were "long range." Toolsie explained that a long-range wound is made when the muzzle of the gun is placed far enough away from the skin that the resulting soot and gunpowder residue do not reach the skin; he stated that "long range" "may be as little as a foot or eighteen inches."

Trooper Rick Leonard, a senior diver with the Tennessee Highway Patrol Special Operations Division, testified that on January 28, 1999, he recovered the murder weapon in this case. Acting

-6-

on information provided by co-defendant Herold Melton, he dove into a rock quarry in McMinn County and found the safe stolen by Melton from the home of Melton's sister. Inside the safe was the murder weapon.

Special Agent Don Carman of the Tennessee Bureau of Investigation testified that he was a forensic scientist specializing in ballistics. He reported that he examined the weapon recovered by Trooper Leonard. Carman recalled that when he received the gun, it was layered in rust and plugged with mud. However, after cleaning the gun, he was able to conduct tests on it. He was able to determine with certainty that four of the bullets recovered from the victims' bodies had been fired from the gun. He also determined that twenty-one of the bullets recovered from the crime scene were fired from the gun. Carman recalled that a total of fifty-three shells were recovered from the crime scene.

Pam Melton testified that she had been married to Mark Melton, Herold Melton's brother, for fourteen years at the time of trial. She stated that she had known the Defendant since January 1998. She recalled that during January and February 1998, she spent a considerable amount of time with the Defendant, who was staying with her brother-in-law, Herold Melton, and she testified that during this time period, the Defendant discussed "killing people" with her. Pam Melton reported that the first conversation of this nature occurred when she, the Defendant, and Herold Melton were driving to a bowling alley in her van. Pam Melton stated that her brother-in-law and the Defendant were "kind of high at this point." According to Pam Melton, the Defendant told her that he and Herold Melton "had killed before, [and] they would kill again . . . ." Melton further testified that the Defendant told her "[t]hat he had killed his uncle, and that he was going to rot in hell for killing his uncle . . . ."

Pam Melton reported that her second conversation with the Defendant on the subject occurred at her grandmother's house approximately four days before the Defendant's arrest. Pam Melton testified that she asked the Defendant whether he had ever killed anyone. Melton stated that the Defendant "was quiet for awhile and then he kind of dropped his head and then he nodded his head . . . ." Melton recalled that she then said, "That's not an answer. Have you ever killed anyone?" and he said, "Yes." According to Melton, the Defendant told her that he had killed "his uncle and Renee." Pam Melton testified as follows:

> [The Defendant] said . . . [h]e went [to the Haupert residence] with Harold [sic] Melton. They went to show Larry [Haupert] a .22 rifle and asked Larry to go out to the backyard and they went out into the backyard, and Renee [Haupert] was standing beside Harold [sic] and was smoking on a cigarette, and she didn't say anything, and then he shot Larry in the back of the head and then he shot him again, I think he said 16 times. . . . And then Harold [sic] grabbed Renee by the arm and led her into the house and [the Defendant] said, "Remember, Harold [sic], no witnesses." He asked Renee where the money was, and Renee gave them the money, and they said it was four thousand dollars, which they split two thousand apiece. So Harold [sic] told Renee to get on her knees and shot her in the back of the head and in the arm and then proceeded to shoot her more. . . . [The Defendant] said they hung around the

house for awhile and took a pound of marijuana out of the house. . . . And then he said they took the .22 to the rock quarry and threw it in.

Pam Melton further testified that before his arrest, the Defendant told her that "he would get [her] if [she] opened her mouth." She maintained that he "grabbed [her] by the throat and slung [her] against the refrigerator and said, 'I will kill you dead, nigger.'"

Pam Melton testified that she and her husband contacted Detective Miller and agreed to "get as much as [they] could on [audio] tapes" for the police. She stated that on the day prior to the Defendant's arrest, she invited the Defendant to her house to attempt to secretly tape-record any statements that he might make about the murders. Detective Miller was in the house waiting with her for the Defendant's arrival. Melton recalled, however, that the Defendant did not show up that evening, but that he did call her on the phone. Melton reported that the Defendant was angry during their telephone conversation, and she allowed Detective Miller to listen to the conversation. She stated that although she attempted to engage the Defendant in conversation about the Haupert murders, the Defendant told her, "You know we are not going to talk about that sh_t on the phone. You know who I am, don't mess with me, don't go there."

Pam Melton reported that on the following day, she picked up the Defendant and brought him to her house, where Detective Miller and Agent Jordan were hiding in a bedroom. She stated that her house was "wired" at the time. Melton recalled that when the Defendant arrived at her house, he repeatedly tried to open the locked door leading to the bedroom where Miller and Jordan were hiding, and she had to physically push him from the door. She testified that after struggling with him, she eventually told him to open the door, and when he did, Miller and Jordan placed him under arrest.

On cross-examination, Pam Melton admitted that she had been convicted of theft over $10,000, but she maintained that her son took the money, which was later found in her home. She further admitted that in order to obtain information from the Defendant, she led the Defendant to believe that a romantic relationship with her was possible; however, she denied ever engaging in sexual relations with the Defendant. In addition, Melton admitted that while the Defendant was in jail, she communicated with him by mail and by phone.

## I. SUFFICIENCY OF THE EVIDENCE

The Defendant first contests the sufficiency of the convicting evidence. In his brief, he states that his conviction was based on "the bought and paid for testimony of his alleged accomplice, Herold Melton . . . ; [t]he testimony of his alleged paramour, Pam Melton, who was so thoroughly impeached throughout her testimony . . . as to defy rational belief," and the testimony of three police officers. He argues that this evidence is not sufficient to support the jury's verdict of guilt.

When an accused challenges the sufficiency of the evidence, an appellate court's standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); Jackson v. Virginia, 443 U.S. 307, 324 (1979); State v. Duncan, 698

S.W.2d 63, 67 (Tenn. 1985). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. State v. Buggs, 995 S.W.2d 102, 105 (Tenn. 1999); Liakas v. State, 286 S.W.2d 856, 859 (Tenn. 1956). Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. Liakas, 286 S.W.2d at 859. This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. Id.

As the Defendant points out in his brief, other than the testimony and written statement of Herold Melton, no direct evidence was presented at trial linking him to the crimes. Nevertheless, a criminal offense may be established exclusively by circumstantial evidence. State v. Jones, 901 S.W.2d 393, 396 (Tenn. Crim. App. 1995); State v. Buttrey, 756 S.W.2d 718, 721 (Tenn. Crim. App. 1988). "A conviction may be based entirely on circumstantial evidence where the facts are 'so clearly interwoven and connected that the finger of guilt is pointed unerringly at the Defendant and the Defendant alone.'" State v. Smith, 868 S.W.2d 561, 569 (Tenn. 1993) (quoting State v. Duncan, 698 S.W.2d 63, 67 (Tenn. 1985)). However, the circumstantial evidence "'must be not only consistent with the guilt of the accused but it must also be inconsistent with his [or her] innocence and must exclude every other reasonable theory or hypothesis except that of guilt, and it must establish such a certainty of guilt of the accused as to convince the mind beyond a reasonable doubt that [the defendant] is the one who committed the crime.'" State v. Tharpe, 726 S.W.2d 896, 900 (Tenn. 1987) (quoting Pruitt v. State, 460 S.W.2d 385, 390 (Tenn. 1970)). The jury decides the weight to be given to circumstantial evidence, the inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence. Marable v. State, 313 S.W.2d 451, 457 (Tenn. 1958).

We also note that the primary evidence connecting the Defendant with the crimes in this case is the testimony of his co-defendant, Herold Melton. A criminal defendant cannot be convicted solely on the uncorroborated testimony of an accomplice. State v.Bane, 57 S.W.3d 411, 419 (Tenn. 2001). Whether the testimony of an accomplice has been sufficiently corroborated is a question for the jury. State v. Heflin, 15 S.W.3d 519, 524 (Tenn. Crim. App. 1999). However, corroborating evidence need not be sufficient in and of itself to support a conviction, but it must fairly connect the Defendant with the commission of the crime. State v. Gaylor, 862 S.W.2d 546, 552 (Tenn. Crim. App. 1992).

Evidence corroborating Herold Melton's testimony was provided by Pam Melton. She testified that the Defendant twice told her that he had killed his uncle and on one occasion provided detailed information about the crimes. This information was consistent with both Herold Melton's testimony and evidence found at the crime scene. In addition, a T.B.I. agent and a police officer each testified that they were able to read the Defendant's lips when he told his co-defendant not to "say anything" after the two men were arrested. Finally, a detective involved in the case testified that he heard the Defendant say "I don't want to talk about killing that mother f__ker" to Pam Melton on the phone.

We conclude that this evidence was sufficient to support the jury's finding of guilt. Although the Defendant argues that the testimony of both Pam and Herold Melton, which unequivocally connected him with the commission of the crimes in this case, was not credible, the jury apparently believed their testimony. It is not within our purview to re-evaluate the jury's findings of fact. See Liakas, 286 S.W.2d at 859. Because we conclude that the evidence presented at trial was legally sufficient to support the Defendant's convictions, we find this issue to be without merit.

## II. IDENTITY OF CONFIDENTIAL INFORMANT

The Defendant asserts that the trial court committed reversible error by refusing to order the State to disclose the identity of the confidential informant who provided police with information about other individuals whom the informant claimed committed the Haupert murders. The Defendant contends that had the State disclosed the identity of this individual, he could have "explor[ed] a lead that could have given rise to reasonable doubt as to the defendant's guilt."

Notes made by Detective Miller containing information about the confidential informant were made part of the record. In the notes, Miller states that a confidential informant provided police with information linking two individuals other than the Defendant and Herold Melton to the crimes in this case. According to the notes, the confidential informant, who was also involved in "an FBI operation," taped the two individuals discussing killing the Hauperts. The notes include a statement by Miller that law enforcement officials planned to obtain a copy of the tapes and a transcript of the conversations contained on the tapes. Later in the notes, Miller states, "FBI Knoxville has the tape transcribed with the 4 subjects talking about [the two individuals] killing the Hauperts. They will provide that part of the transcripts containing this conversation but they don't want their information blown."

However, prior to trial, Detective Miller subsequently advised the trial court that the information contained in the notes was not true. He stated that he had received the information from another police officer, and upon further investigation, he learned that the taped conversations did not exist. He stated that the tapes which he received from the informant were transcribed, but the conversations that the informant had reported were not on the tapes. Miller also testified that he sent fingerprints of the individuals involved in the alleged conversation to be tested, and he reported that the results came back "negative." Miller concluded that the informant had not been truthful to law enforcement officers and for this reason, excluded the individuals as suspects.

Prior to trial, the court conducted an in-camera hearing on the matter. With regard to the hearing, the trial court stated,

> I had the FBI agent here and the FBI, they are the ones that did not want this informant's name revealed because there is a pending investigation that involves a lot of people that the federal government are [sic] after, and basically the information that he had was that Officer Miller or someone here made the inquiry about these taped conversations and that they were controlled and they had taped conversations with him and they were transcribing them, but he also said [that in] the ones [that were] transcribed there was nothing about any Haupert murder.

The trial court thus ruled that the defense was not entitled to know the identity of the confidential informant.

In State v. Vanderford, 980 S.W.2d 390 (Tenn. Crim. App. 1997), this Court set forth the parameters for disclosure of a confidential informant's identity. We noted that "[t]he privilege afforded confidential informants is not absolute," id. at 396, and that "[t]here is no fixed rule regarding when the state must divulge the identity of a confidential informant to the defendant." Id. Nevertheless, this Court concluded that the state is required to divulge the identity of a confidential informant when any of the following apply: (1) "disclosure would be relevant and helpful to the defendant in presenting his defense and is essential to a fair trial," id. at 397; see also House v. State, 44 S.W.3d 508, 515 (Tenn. 2001); (2) the informant participated in the crime, Vanderford, 980 S.W.2d at 397; (3) the informant witnessed the crime, id.; or (4) "the informant has knowledge which is favorable to the defendant." Id. The defendant bears the burden of establishing by a preponderance of the evidence that one of the foregoing factors applies. Id.

The question of whether the State should be required to disclose the identity of a confidential informant addresses itself to the discretion of the trial court. Id. at 396. The trial court must resolve this question on a case-by-case basis. Id. In addition, we note that the Tennessee Supreme Court has concluded that "a trial court, in its discretion, may order an in-camera examination of the informant as an alternative to denying or ordering pretrial disclosure." House, 44 S.W.3d at 515. However, "[t]rial courts should . . . explore whether other means of proof might obviate the informant's testimony." Id.

Having reviewed the record, including the in-camera hearing conducted by the trial court prior to trial, we are unconvinced that the State should have been required to divulge the identity of the confidential informant. The Defendant has failed to demonstrate by a preponderance of the evidence that any of the four circumstances which would have required a disclosure of the informant's identity existed. No evidence was presented that the informant witnessed or participated in the crimes. Furthermore, there is no indication in the record that the tapes to which Detective Miller alluded in his notes contained any information concerning the Haupert murders. All parties involved, including Detective Miller and an F.B.I. agent who testified at the in-camera hearing, stated that a mistake was made and that the taped conversations did not exist. Thus, we conclude that no evidence was presented that the informant had knowledge which was favorable to the defendant or that disclosure of the informant's identity would have been helpful to the defendant in presenting his defense. Rather, the record indicates that the informant merely provided information

to law enforcement officers which, upon further investigation, proved to be untrue. We therefore conclude that the trial court did not abuse its discretion by refusing to order the State to disclose the informant's identity.

### III. TESTIMONY BY HEROLD MELTON

The Defendant argues that the trial court erred by allowing Herold Melton to testify against him. He first contends that the Melton's testimony was obtained in violation of disciplinary rule 7-109(C), which states that a lawyer may not pay, offer to pay, or acquiesce in the payment of compensation contingent upon the content of his testimony or the outcome of his case. Tenn. R. Sup. Ct. 8, DR 7-109(C). Because Melton received neither payment nor an offer of payment in exchange for his testimony, we conclude that disciplinary rule 7-109(C) was not violated in this case.

The Defendant also contends that Melton's testimony was obtained in contravention of the safeguards set forth in State v. Bolden, 979 S.W.2d 587 (Tenn. 1998), that must be followed in order to admit testimony procured through a plea bargain. Generally, the testimony of an accomplice is admissible, even if obtained through a plea agreement. Id. at 590. "A promise of leniency or other favorable agreement goes only to the credibility of a witness's testimony, not to its admissibility." Id. However, in order to protect a defendant's rights to due process and a fair trial, the Tennessee Supreme Court has set forth the following safeguards that must be in place before admitting testimony obtained through a plea agreement: (1) The court must require "full disclosure of the terms of the agreements struck with the witnesses," id.; (2) the court must allow "the opportunity for full cross-examination of those witnesses concerning the agreements and the effect of those agreements on the testimony of the witnesses," id.; and (3) the court must provide "instructions cautioning the jury to carefully evaluate the weight and credibility of the testimony of such witnesses who have been induced by agreements with the State to testify against the defendant." Id. Furthermore, our supreme court has stated that "a plea agreement may not be conditioned upon false, scripted, predetermined, or specific testimony without regard for the truthfulness of the witness' testimony . . . ." Id. at 591.

On cross-examination, Melton admitted that he had entered into a plea agreement with the State whereby he was to provide testimony consistent with his statement to police and to assist the police with an ongoing investigation in exchange for a twenty-five-year sentence. The jury was thus apprised of the terms of Herold Melton's plea agreement with the State. Furthermore, defense counsel was allowed ample opportunity to cross-examine Melton about the agreement and in fact, vigorously cross-examined Melton, highlighting for the jury an inconsistency in his statement to police. In addition, the court instructed the jury that Melton was an accomplice and therefore that his testimony required corroboration. The trial court also provided the jury with standard instructions on witness credibility and the impeachment of witnesses. Finally, the plea agreement in this case was conditioned upon Herold Melton providing truthful testimony consistent with the statement he provided to police on the night of his arrest. We therefore conclude that Herold Melton was properly allowed to testify against the Defendant.

## IV. ADMISSION OF VIDEO TAPE INTO EVIDENCE

The Defendant next argues that the trial court erred by allowing into evidence the video tape of his arrest. He contends that the video tape did not assist the jury in determining his guilt or innocence, and he maintains that the tape was unduly prejudicial.

The Tennessee Rules of Evidence state that all relevant evidence is generally admissible. Tenn. R. Evid. 402. Relevant evidence is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. However, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403.

A copy of the video tape of the Defendant's arrest is not included in the record. It is the Defendant's duty to prepare an adequate record for appellate review. Tenn. R. App. P. 24(b). Nevertheless, we note that the trial court conducted a hearing concerning the admissibility of the tape. At the hearing, the defense argued that the tape was unduly prejudicial for the following reasons: (1) The tape apparently depicted the Defendant using what the defense characterized as "continued bad language throughout the tape." (2) The defense contended that the Defendant was engaged in an extramarital affair with Pam Melton and stated "because of that connection that could be one of the reasons why he is behaving this way." After the hearing, however, the trial court concluded that the tape was probative for several reasons: The court noted that the tape would allow the State to counter the defense attack on Pam Melton's credibility. The court also noted that the defense had challenged Detective Miller's identification of the Defendant's voice during the telephone conversation that the Defendant had with Pam Melton. The court concluded that the tape was probative because the Defendant used expletives on the tape consistent with those used in the telephone conversation that Detective Miller overheard and that the Defendant's speech patterns on the tape and during the telephone conversation were similar. Finally, the trial court stated that the Defendant's use of expletives on the tape and "the fact that he . . . may or may not have had an extra-marital affair" were not so prejudicial as to outweigh the probative value of the tape. The trial court therefore admitted the tape into evidence. In the absence of an adequate record, we must conclusively presume that these determinations by the trial court were correct. State v. Oody, 823 S.W.2d 554, 559 (Tenn. Crim. App. 1991).

## V. HEARSAY EVIDENCE

The Defendant next argues that the trial court erred by allowing Detective Miller to testify about a statement he heard the Defendant make during the Defendant's phone conversation with Pam Melton. Detective Miller testified that he heard the Defendant say, "I don't want to talk about killing that mother f__ker." The Defendant contends that this statement constituted inadmissible hearsay evidence and that it therefore should have been excluded from evidence.

Hearsay evidence is not admissible unless it fits into an exception to the hearsay rule. See Tenn. R. Evid. 801(c), 802. One exception to the hearsay rule is an admission by a party-opponent, which is defined, in pertinent part, as "[a] statement offered against a party that is . . . the party's own statement in either an individual or representative capacity . . . ." Tenn. R. Evid. 803(1.2). We conclude that the Defendant's statement to Pam Melton was clearly an admission of guilt, and it was offered against him at trial. Because we conclude that the Defendant's statement falls into an established hearsay exception, we conclude that the trial court did not err by allowing it into evidence.

## VI. INTRODUCTION INTO EVIDENCE OF HEROLD MELTON'S ENTIRE WRITTEN STATEMENT

The Defendant argues that the trial court erred by allowing into evidence the entire written statement that Herold Melton provided to police. He contends that the statement "severely prejudice[d] the defendant and bolstered the credibility of one of his chief accusers." In his brief, the Defendant states, "In the instant case, the court essentially punished the defendant for merely attempting to demonstrate that his alleged co-defendant had previously lied to law enforcement on several occasions," and he complains that he was forced to "walk[] a fine line between virtually no impeachment at all from a previous statement of his co-defendant . . . or opening the door and bolstering [his] accuser[]."

During cross-examination of Herold Melton, defense counsel asked Melton to read to the jury a portion of the sworn statement that he provided to police. Immediately after Melton read the portion of his statement aloud, the State moved for admission of the entire statement. The trial court ruled that the entire statement was admissible under Rule 106 of the Tennessee Rules of Evidence and instructed the jury as follows:

> I'm allowing [the entire statement] in, ladies and gentlemen, not to prove the truth of anything in that statement. The truth and falsity of that statement is a question of fact you must . . . determine. I'm letting that statement in because a question was asked of . . . Harold [sic] Melton . . . from that statement. I felt like at that point that you deserved to see the whole statement to help you decide whether or not any evidence should be accepted as true or not. That's up to you.

Rule 106 of the Tennessee Rules of Evidence provides as follows: "When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness be considered contemporaneously with it." This rule "allows the trier of fact to 'assess related information at the same time rather than piecemeal.'" State v. Keough, 18 S.W.3d 175, 182 (Tenn. 2000) (quoting Neil P. Cohen et al., Tennessee Law of Evidence § 106.1, at 33 (3d ed. 1995)). Evidence offered pursuant to Rule 106 "must be relevant to issues in the case . . . and . . . must explain or qualify already-admitted evidence." State v. William Pierre Torres, No. E1999-00866-CCA-R3-DD, 2001 WL 245137, at *33 (Tenn. Crim. App., Knoxville, Mar. 13, 2001) (citing United States v. Glover, 101 F.3d 1183, 1190 (7th Cir. 1996); United States v. Pendas-Martinez, 845 F.2d 938, 944 (11th Cir. 1988)). To determine whether the evidence explains or qualifies already

admitted evidence, courts should consider whether the evidence "(1) explains the admitted proof; (2) places the admitted proof in context; (3) avoids misleading the trier of fact; or (4) ensures a fair and impartial understanding of the proof." Id. (citing United States v. Jackson, 180 F.3d 55, 73 (2d Cir. 1999); Glover, 101 F.3d at 1190; United States v. Sources, 736 F.2d 87, 91 (3d. Cir. 1984)). This Court has emphasized that Rule 106 is a rule of timing rather than of admissibility. Denton v. State, 945 S.W.2d 793, 801 (Tenn. Crim. App. 1996). "The rule assumes that the remaining portion of [a] statement [admitted pursuant to Rule 106] would be ultimately admissible." Id. Finally, we note that a trial court's determination concerning the admission of evidence pursuant to Rule 106 will be reversed on appeal only when there has been an abuse of discretion. Id.

In admitting Herold Melton's entire statement, the trial court relied upon State v. Boyd, 797 S.W.2d 589 (Tenn. 1990). In Boyd, the Tennessee Supreme Court noted that ordinarily, evidence of prior consistent statements may not be used to rehabilitate an impeached witness. Id. at 593. However, the court opined that "[w]here specific questions and answers taken out of context do not convey the true picture of the prior statement alleged to be inconsistent, it is unfair to permit reference to isolated, unexplained responses by the witness," and thus, the trial court may allow the statements to be placed in context. Id. at 594.

In the present case, Melton testified on direct examination that he first shot Renee Haupert "[i]n the chest" while she was facing him. He stated that she "fell face down" and that he then "shot her a few more times." On cross-examination, defense counsel questioned Melton as follows:

Q: Now, you testified on direct examination, sir, is it not true, that when you shot Renee Haupert the first time you shot her in the chest. Correct?
A: Yes, sir.
. . . .
Q: Then you testified, sir, is it not true, that you don't recall how many times you shot her.
A: Yes, sir.
Q: Today that's what you testified to. Sir, I have in my hand a copy of your previous sworn statement that you tendered to Agent Jordan of the Tennessee Bureau of Investigation. . . .
. . . .
Q: I would ask . . . that you read the high lighted portion to the jury.
. . . .
A: "Around and fell face down. After that I emptied the gun into her back and head."
. . . .
Q: So it is true, is it not, sir, that instead of not being able to remember how many times you in fact shot her that you shot her 16 or 17 times in the back and in the head with your rifle.
A: Yes.

Although the statement that Melton "shot her a few more times" is arguably inconsistent with the statement that he "emptied the gun into her back and head," we are not convinced that fairness required the admission into evidence of Melton's entire statement to police so as to "convey the true

picture of the prior statement alleged to be inconsistent" with his responses to questioning at trial. Id. Melton's entire statement to the police is certainly relevant to the issues in this case, but only a very small portion of the statement helps to "explain or qualify already-admitted evidence," William Pierre Torres, 2001 WL 245137, at *33, namely Melton's testimony on direct examination concerning how many times he shot Renee Haupert. Thus, we conclude that Melton's entire prior statement should not have been admitted under Rule 106 of the Tennessee Rules of Evidence.

Nevertheless, we conclude that the trial court did not abuse its discretion by admitting Melton's entire statement to police into evidence. As previously stated, prior consistent statements are not ordinarily admissible to rehabilitate an impeached witness. Boyd, 797 S.W.2d at 593. However, "prior consistent statements may be admissible . . . to rehabilitate a witness when insinuations of recent fabrication have been made, or when deliberate falsehood has been implied." State v. Benton, 759 S.W.2d 427, 433 (Tenn. Crim. App.1988). A prior consistent statement is admissible only if the witness' testimony was assailed or attacked to the extent that the witness' testimony requires rehabilitation. Id. at 433-34. In this case, defense counsel questioned on cross-examination the integrity of the entire statement Melton made to police. Counsel emphasized through his cross-examination of Herold Melton that Melton's plea agreement required him to testify consistently with his prior statement and that if Melton failed to do so, the "whole deal [would be] off," resulting in the possibility that Melton would be required to serve an additional twenty-five years in prison. Counsel also asked Melton whether he could find the following words or phrases in his prior statement: "the truth," "truthful testimony," "honest," and "honest statement." Because defense counsel challenged the veracity of Melton's statement and the integrity of Melton's plea agreement with the State, we conclude that the jury was entitled to consider Melton's entire statement for the purpose of assessing Melton's credibility as a witness. The jury was entitled to determine the degree, if any, to which Melton's prior statement to police varied from his testimony at trial. We therefore find no error in the admission into evidence of Melton's prior statement to police.

## VII. EXCULPATORY EVIDENCE

The Defendant argues that the State withheld exculpatory evidence from him. Specifically, he complains that the State failed to disclose "that Mark Melton and Pam Melton knew of Herold Melton's participation in the crime a short period of time after the completion of the offense, thereby denying the Defendant the opportunity to investigate and develop a possible defense for the Defendant."

In Brady v. Maryland, 373 U.S. 83 (1963), the United States Supreme Court established the prosecution's duty to furnish the accused with exculpatory evidence that is material to either the accused's guilt or innocence or to the potential punishment which may be imposed. In order to establish a due process violation under Brady v. Maryland, a defendant must demonstrate the following:

> 1. The defendant must have requested the information (unless the evidence is obviously exculpatory, in which case the State is bound to release the information whether requested or not);

2. The State must have suppressed the information;

3. The information must have been favorable to the accused; and

4. The information must have been material.

State v. Edgin, 902 S.W.2d 387, 389 (Tenn. 1995).

In order to establish that exculpatory evidence is "material," a defendant must show that "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." Kyles v. Whitley, 514 U.S. 419, 435 (1995); see also Edgin, 902 S.W.2d at 390. There must be a "'reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" Edgin, 902 S.W.2d at 390 (quoting Kyles, 514 U.S. at 435). In Kyles v. Whitley, the United States Supreme Court urged that the cumulative effect of the suppressed evidence be considered to determine materiality. 514 U.S. at 436.

The State is not required to disclose information that the accused already possesses or is able to obtain, State v. Marshall, 845 S.W.2d 228, 233 (Tenn. Crim. App. 1992), or information which is not possessed by or under the control of the prosecution or another governmental agency. Id. Under Brady, the individual prosecutor has a duty to learn of any favorable evidence known to others acting on the government's behalf in the case, including the police. Kyles, 514 U.S. at 437.

The Defendant states in his brief that he filed a request for discovery and a "Motion to Reveal Any Agreements Entered Into Between State and Prosecution Witnesses," the latter of which he contends "dealt in greater detail with Herold Melton, Pam Melton and Mark Melton." However, we find no such motions included in the record. As previously stated, it is the duty of the Defendant to prepare an adequate record for appellate review. Tenn. R. App. P. 24(b).

Nevertheless, the trial record does contain some discussion concerning this issue. During a jury-out hearing, counsel for the defense addressed this issue as follows:

> Lora Melton[4] and her mother both indicated to the state of Tennessee that some two weeks after the murders, . . . Harold [sic] Melton disclosed to Mark Melton that he had participated in these murders, and since that time Pam and Mark Melton knew the facts concerning the murders as they received them from Harold [sic] Melton, and actively worked with him to conceal those facts from governmental authorities, and did so for approximately two years. And the reason why they did that, your Honor, was because they were extorting money from Harold [sic] Melton on a weekly basis of $50.00 to . . . $100.00 a week. Now, your Honor, I don't know whether or not these allegations are true, but I simply want to go on the record indicating that we asked for this information, the Court ordered that if anything, including grants of immunity or any failure to prosecute or not to prosecute or any deals were worked out, that the State had an obligation to disclose that information to us.

---

[4] There is no indication in the record of Lora Melton's identity.

The Attorney General replied that the State had complied with every request from the defense and had given the defense all of the information that it possessed. The Attorney General next stated that Mark Melton had reported to police that Herold Melton told him "early on" about the murders, but Mark Melton "just kind of blew it off because Herold was doing drugs and he thought the kid was just talking big." The Attorney General then stated that he had no knowledge that Pam Melton was aware of any such information, and he also reported that the State had received no information indicating that Mark Melton was an accessory after the fact or had actively participated in concealing the crimes.

The only other evidence in the record regarding this issue was elicited from Pam Melton. On cross-examination during a jury-out hearing, defense counsel asked Pam Melton if Herold Melton had told her prior to January 1998 of his involvement in the Haupert murders. Pam Melton replied that he had not. Defense counsel also asked her if she had received monetary payments from Herold Melton over time, and she responded that she had not.

Based upon the record before us, we conclude that the Defendant has failed to demonstrate that a <u>Brady</u> violation occurred in this case. There is no evidence in the record, aside from remarks made by defense counsel, that Pam and Mark Melton withheld information from police or extorted money from Herold Melton. In fact, when questioned about this issue, Pam Melton denied any prior knowledge of Herold Melton's involvement in the crimes, and she denied receiving any payments from Herold Melton. However, even assuming that the State withheld such information from the defense, the Defendant has not shown that the information was material. We are unconvinced that had the evidence been disclosed to the defense, "'the result of the proceeding would have been different.'" <u>Edgin</u>, 902 S.W.2d at 390 (quoting <u>Kyles</u>, 514 U.S. at 435). The evidence at issue simply does not exculpate the Defendant. We find this issue to be without merit.

## VIII. INDIVIDUAL VOIR DIRE REGARDING PRETRIAL PUBLICITY

Finally, the Defendant argues that the trial court erred by failing to conduct individual voir dire of the prospective jurors for this case. He states that the "court's initial questioning of the venire was conducted in a manner as to preclude individual voir dire" and requests that this Court remand the matter to the trial court with instructions on "how to best effectuate individual voir dire of the venire." However, the record does not contain a transcript of voir dire. It is the duty of the appealing party to prepare a fair, accurate and complete record on appeal to enable meaningful appellate review. Tenn. R. App. P. 24(b). The Defendant has waived this issue for failure to provide this Court with a complete record on appeal. <u>Id.</u>; Tenn. R. Crim. P. 12(g); <u>State v. Griffith</u>, 649 S.W.2d 9, 10 (Tenn. Crim. App. 1982). Nevertheless, we note, as the State points out in its brief, that the trial court apparently did allow individual voir dire of two potential jurors "who indicated to [the trial court] that they might say something that might prejudice some other juror . . . ." We also note that "the control of voir dire rests within the sound discretion of the trial judge." <u>Oody</u>, 823 S.W.2d at 563. We therefore find this issue to be without merit.

Accordingly, we AFFIRM the judgment of the trial court.

_____

ROBERT W. WEDEMEYER, JUDGE